UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Brent Buzzell,

                Plaintiff,

                                        Civ. No. 10-2046 (RHK/FLN)
                                        **MEMORANDUM OPINION**
                                        **AND ORDER**

v.

Citizens Automobile Finance, Inc.,
Remarketing Solutions, LLC, and
Professional Recovery Services & Collections,

                Defendants.

---

Trista M. Roy, Consumer Justice Center PA, Vadnais Heights, Minnesota, for Plaintiff.

Robert E. Kuderer, Jenna M. Powers, Johnson & Condon, PA, Minneapolis, Minnesota, for Defendants

---

**INTRODUCTION**

This action arises out of the repossession of Plaintiff Brent Buzzell's vehicle. Buzzell alleges that in the course of the repossession, Defendants (1) violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692f(6)[1]; (2) breached the peace in violation of Minn. Stat. §336.9-609; and (3) committed common-law torts of conversion and trespass to chattel. Each side has moved for summary judgment.[2] For the

---

[1] The FDCPA claim is only asserted against Defendants Remarketing Solutions, LLC, and Professional Recovery Services & Collections. (See Am. Compl. ¶ 26.)

[2] The Motions were not originally styled as cross-Motions, and Buzzell's Motion seeks only partial summary judgment on the issue of liability. Nonetheless, both Motions focus on the same issues—in fact, Buzzell's brief in support of summary judgment is largely copied and pasted

reasons below, Buzzell's Motion will be granted, and Defendants' Motion will be denied.

## BACKGROUND

**I.     Buzzell's Loan**

Buzzell purchased a 2007 Dodge Charger on April 3, 2008.  He financed the purchase with a loan from Defendant Citizens Automobile Finance, Inc. ("Citizens") for $21,781.19.  Pursuant to his contract with Citizens, Buzzell owed monthly payments of $366.88 beginning on May 18, 2008, and due on the 18th of each month thereafter until the balance was paid.  The contract provided for a grace period of 10 days, however, before payments would be deemed late and charges imposed.  The contract also afforded Citizens the following right in the event Buzzell defaulted on the loan:

> We may immediately take possession of the [vehicle] by legal process or self-help, but in doing so we may not breach the peace or unlawfully enter onto your premises.  We may then sell the [vehicle] and apply what we receive as provided by law to our reasonable expenses and then toward what you owe us.

(Kuderer Aff., Apr. 27, 2011 (Doc. No. 79) ("First Kuderer Aff."), Ex. 10, at 2.)

Buzzell failed to timely make his loan payments.  His very first payment in May 2008 was late, although within the grace period, and it was followed by a series of late payments, many of which were more than 10 days late.  (E.g., Deposition of Alves, Part I ("Alves Dep. I") at 19-25; Buzzell Dep. at 69.)  As Buzzell began to fall behind on his payments, Citizens attempted to contact him several times, both through phone calls and letters.  It used automatically generated form letters specific to the state in which a debtor

---

from his brief in opposition to Defendants' Motion.  Accordingly, the Court determined to treat them as cross-Motions.  (See May 26, 2011 Order (Doc. No. 94).)

resided, and all the letters were "approved by legal" before they were used. (Deposition of Alves, Part II ("Alves Dep. II") at 25.) By January 2009, Buzzell was two months and $733.76 behind on the account. (Id. at 28-29.) Citizens sent him a letter on January 16, 2009, which provided:

> As of this date, you have not responded to any of our attempts to assist you with repayment of your delinquent account.
>
> If you do not bring your account current by paying the total amount past due or by contacting us at the number below within five (5) days of receipt of this letter, we will take further action to secure payment, which may include acceleration of this loan. We hope this situation is resolved prior to our taking any such action.

(Roy Aff. May 18, 2011 ("First Roy Aff") (Doc. No. 86) Attachment to Ex. A.) Yet Buzzell remained behind and continued to make late and partial payments between January and August of 2009. (Alves Dep. II at 35-43.) Citizens sent additional letters with the same or similar language on February 17, April 7, April 16, May 5, May 22, June 16, and July 17. (See First Roy Aff., Attachment to Ex. A.) Throughout this time, the past-due balance on Buzzell's account varied, but he always remained at least one month behind. (See id.) Citizens acknowledges that it repeatedly accepted Buzzell's late and partial payments. (Alves Dep. I at 32.)

On August 29, 2009, Buzzell was three months behind on his loan payments, and Citizens repossessed the vehicle, towing it from the parking lot at his workplace. (Buzzell Dep. at 13-14.) Following the repossession, Buzzell spoke to someone in Citizens' repossession department, who agreed Buzzell could recover the vehicle if he made two full payments plus the repossession fees—a total of $1,173.76. (Alves Dep. II

at 48-49.)  He borrowed this money from his girlfriend's father and drove from his home in Plymouth, Minnesota, to Milwaukee, Wisconsin, where the vehicle was being held, to retrieve it.  (Buzzell Dep. at 22, 69-70.)  Even after recovering his vehicle, he remained one month behind on his loan payments.  (Alves Dep. II at 51.)

Buzzell continued to make sporadic late and partial payments between September 2009 and January 2010.  Citizens sent him additional letters attempting to collect the past-due amounts owed.  The last letter in the record was sent on December 17, 2009, and its language is identical to that of the January 16, 2009 letter.  (First Kuderer Aff. Ex. 11.)  Additionally, Citizens claims it made various attempts to contact Buzzell via telephone throughout January and "left repeated messages at the phone number on file."  (Alves Dep. I, at 41-47.)  Many of these phone calls were not made by Citizens but by Leading Edge Recovery Solutions, an entity Citizens sometimes used to make collection calls on its behalf.  (Id. at 42-45.)  Although Citizens had phone contact with Buzzell earlier in the life of his loan, it began to receive call-backs stating that the number it had on file did not belong to Buzzell.  (Id. at 47.)

Buzzell made two payments in January 2010, which Citizens accepted—one on the 4th and one on the 15th.  (Buzzell Aff. ¶ 4; Alves Dep. I, at 34.)  Yet his account remained past-due. On February 8, 2010, Citizens decided to repossess Buzzell's vehicle again.  (Alves Dep. I, at 50.)  This repossession is the subject of the instant Complaint.

## II.     Repossession of Buzzell's Vehicle

Citizens does not complete its own repossessions; rather, it has a contract with Defendant Remarketing Solutions, LLC ("Remarketing"), which facilitates vehicle

4

repossessions on behalf of lenders and then titles and remarkets the repossessed vehicles. (Hanks Dep. at 5.) When Citizens decides to repossess a vehicle, it sends a "repossession order" to Remarketing. Remarketing then acts as a middle-man; it does not complete the repossession itself, but instead forwards the assignment to a repossession agent in the area where the property is located. (Id. at 5, 16.) Remarketing does not have its own repossession procedures, other than requiring that all local laws be followed during the repossession process. (Id. at 37.) It relies on its repossession agents to know and follow the local laws regarding repossession activity. (Id. at 17.)

Remarketing received the so-called "repossession order"[3] for Buzzell's vehicle on February 9, 2010. (Id. at 13-14.) This order contained vehicle information and Buzzell's name and last known address; it did not specify how the repossession was to be accomplished. (Id. at 17.) Remarketing forwarded the assignment to Defendant Professional Recovery Services & Collections ("PRSC"), a Minnesota repossession agency that Remarketing occasionally uses. The order was transmitted through a computer system called IRIS, a system used by Remarketing to communicate both with Citizens and its repossession agents. (E.g., id. at 14.) Once the repossession was assigned to PRSC, PRSC provided progress updates on IRIS. (Id. at 18.)

The actual repossession took place sometime around 2:00 a.m. on Saturday, February 20, 2010. At the time, the vehicle was parked in one of four community garages at the Plymouth Oaks Apartments, where Buzzell lived. This garage had a

---

[3] At the hearing on these Motions, counsel for Buzzell disputed this characterization, arguing that calling it a "repossession order" implies it is a court-issued order for replevin, while the document in this case was more accurately a "work order."

keypad that required an access code for entry. (E.g., Fietek Dep. at 17; Buzzell Aff. ¶ 6.) Tenants pay approximately $50 per month in addition to their normal rent to use a parking space in one of the community garages. (Buzzell Dep. at 48.) They receive the access code in a tenant welcome packet upon moving into the apartment complex. (Fietek Dep. at 17.)

Kurk Nelson, a tow-truck driver for PRSC, testified that he went to Plymouth Oaks to repossess the vehicle after receiving a call from Brandon Keck, another PRSC repossession agent,[4] informing him of the vehicle's location. (Nelson Dep. at 27-28.) According to Nelson, Keck had spoken to the property manager at the apartment and obtained the access code for the garage door. (Id. at 30-31.) Nelson gained access to the garage, hooked up Buzzell's vehicle, and towed it away. The details of how Nelson obtained access are disputed, however.

Nelson testified in his deposition that the garage door was closed when he arrived and he used the access code to open it and enter. (Id. at 30-31, 38.) However, in a "driver's statement" he provided on February 23, 2010, after Remarketing requested it from PRSC, Nelson stated, "[w]hen I got there the garage door was open, so I entered." (First Kuderer Aff., Ex. 16.) Similarly, Paul Warnert, PRSC's owner and Nelson's boss, testified in his deposition that Nelson told him the garage door was open when he arrived.

---

[4] Paul Warnert, the owner of PRSC, does not recall that a second agent was involved in repossession Buzzell's vehicle. (Warnert Dep. at 26-27.) Neither party has obtained a deposition or affidavit from Keck; thus, the only evidence of his involvement comes from the testimony of Kurk Nelson. According to Nelson, Keck only worked for PRSC for a month or two, and he has not spoken to him since. (Nelson Dep. at 31-32.) Buzzell has submitted an employment application purportedly filled out by Keck for employment with PRSC, dated February 12, 2010. (Roy Aff. May 25, 2011 ("Second Roy Aff."), Ex. C.)

(Warnert Dep. at 28-29.)  When asked about these discrepancies, Nelson testified that he does not believe the garage door was open, and he has "no idea" why he indicated otherwise in his driver's statement.  (Nelson Dep. at 35.)

Nelson also testified that he obtained the access code from Keck, who he believed had obtained it from the property manager.[5]  (Id. at 30-31.)  Yet the property manager, Diane Fietek, has given conflicting accounts of whether she gave out the access code.  The day after the repossession, Buzzell inquired whether she had given out the code and asked her to write and sign a statement; she did so, stating that "Plymouth Oaks Apartments did not give authorization to enter the community garage on Plymouth Oaks property."  (First Roy Aff. Ex. D.)  In her deposition, however, Fietek testified that she felt "very foolish" for signing such a general statement, and admitted she had "probably not" checked with the two other women who sometimes worked in the apartment complex's office before writing the statement.  (Fietek Dep. at 42-46.)  She testified she did not recall whether she gave out the code or not and that she may have done so if someone showed her "enough credentials."  (Id. at 70-71.)  However, she also stood by her written statement, acknowledging that her memory at the time she wrote it was probably better than at the time of her deposition.  (Id. at 69-71.)  Later, Fietek signed a

---

[5] No one has deposed Keck.  Initially, both sides claimed they were unable to locate him.  At the hearing, however, counsel for Buzzell indicated she had spoken to him on the phone, at which time he made threats to her.  Defendants did obtain a declaration from a former PRSC employee, Shane Asleson, who claims he worked with Keck and was present when Keck spoke to the apartment manager and obtained the garage code.  Asleson was not disclosed as a potential witness, however, and Buzzell objects to his declaration.

declaration prepared by counsel for Defendants, which provides that she spoke to Nelson on February 18, 2010. (Id. at 83-84.)

In any event, Nelson towed Buzzell's vehicle out of the garage, and Buzzell was awakened by a neighbor who observed his vehicle getting towed. (Buzzell Dep. at 40.) Buzzell followed the tow truck in his other vehicle. He testified that there was an SUV driving behind the tow truck, which he believes tried to run him off the road when he attempted to pass it. (Id. at 41-43.) The tow truck eventually pulled over near a police officer who was engaged in another stop. (Id. at 44; Nelson Dep. at 32.) Buzzell pulled over in front of the tow truck and approached Nelson, stating he had paid his bill and wanted his vehicle back. The officer approached and ultimately allowed Nelson to drive away with Buzzell's vehicle. A police report was prepared, which indicates only that "[a] vehicle was repo[ssess]ed from a garage," and that "[Buzzell] said the repo man did not have permission to go into the garage and take the vehicle." (First Kuderer Aff. Ex. 13.)

Following the repossession, the vehicle was re-sold and the proceeds from this sale were applied to the balance of Buzzell's loan with Citizens, although the proceeds were insufficient to pay off the entire balance. Buzzell commenced the instant action on May 13, 2010, against Citizens, Remarketing, and PRSC. Discovery has closed, and both sides have now moved for summary judgment. The Court heard oral arguments on July 7, 2011, and the Motion is ripe for decision.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is

8

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Vehicleraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering Defendants' Motion, the Court views the record in the light most favorable to Buzzell, and when considering Buzzell's Motion, the Court views the record in the light most favorable to Defendants. Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc., 293 F.3d 402, 404 (7th Cir. 2002). "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Id.

## ANALYSIS

**I.   FDCPA Claim (Count I)**

The FDCPA prohibits "[t]aking or threatening to take any nonjudicial action to effect dispossession or disablement of property if — (A) there is no present right to

possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f(6). Buzzell alleges Citizens did not have a present right to possess the vehicle because it failed to give adequate notice; thus, he claims § 1692f(6) was violated.

As an initial matter, Defendants argue that the FDCPA does not apply to any of them. Buzzell chose not to assert Count I against Citizens, so the Court must address only whether the statute applies to PRSC and Remarketing.

Courts in this district have plainly held that § 1692f(6) of the FDCPA does apply to repossession companies. E.g., Revering v. Norwest Bank Minn., N.A., Civ. No. 99-480, 1999 WL 33911360, at *5 (D. Minn. Nov. 30, 1999) (Kyle, J.) ("[R]epossession companies may be liable for violations of § 1692f(6)"); James v. Ford Motor Co., 842 F. Supp. 1202, 1207 (D. Minn. 1994) (Doty, J.) ("[T]he [FDCPA] does explicitly extend to repossession companies when they act in 'the enforcement of security interests' of others." (citing 15 U.S.C. §§ 1692a(6), 1692f(6))). Hence, there can be no serious question that § 1692f(6) applies to PRSC, and Defendants' arguments to the contrary are misplaced.[6]

In this Court's view, the FDCPA also applies to Remarketing as well even though Remarketing is a "middle man" between the creditor and the repossession company. The FDCPA explicitly provides that "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement

---

[6] Specifically, Defendants rely upon Jordan v. Kent Recovery Servs., Inc., 731 F. Supp. 652, 657-58 (D. Del. 1990). Jordan held, however, that "the legislative history [of the FDCPA] confirms that Congress intended an enforcer of a security interest, such as a repossession agency, to fall outside the ambit of the FDCPA for all purposes *except the prohibitions described in § 1692f(6)*." Id. at 658 (emphasis added). It thus fails to support Defendants' position.

of security interests" may be held liable under § 1692f(6) of the FDCPA. See 15 U.S.C. § 1692a(6). This encompasses Remarketing just as it does repossession companies.

Having determined that § 1692f(6) appropriately applies to both Remarketing and PRSC, the Court turns to the merits of Buzzell's FDCPA claim. "A court should look to state law requirements to determine whether there was a present right to possession under the FDCPA." Revering, 1999 WL 33911360, at *5. Under Minnesota law (as discussed more fully below), a secured party may engage in self-help repossession as long as it does not breach the peace. See Minn. Stat. § 336.9-609. It may not do so, however, unless the debtor has notice of the intent to repossess. Such notice may derive either from the terms of the security agreement itself or from a strict compliance letter, also known as a Cobb notice, as detailed below.

In Cobb v. Midwest Recovery Bureau Co., 295 N.W.2d 232, 237 (Minn. 1980), the Minnesota Supreme Court held that once a creditor that has a contractual right to repossess secured property has repeatedly accepted late payments, it must "notify the debtor that strict compliance with the contract terms will be required before the creditor can lawfully repossess the collateral." In this case, it is undisputed that Citizens' contract with Buzzell gave it the right to repossess his vehicle if he defaulted. Buzzell argues, however, that Citizens repeatedly accepted his late payments and did not give adequate notice before the repossession.

The evidence shows, and Defendants do not dispute, that the last letter Buzzell

received from Citizens prior to the repossession was dated December 17, 2009.[7] (See Buzzell Aff. ¶ 3; Alves Dep. at 33, 49.) It gave him five days to either pay the amount past due or contact Citizens. More than five days after this letter, Buzzell made two $300-dollar payments on January 4 and January 15, 2010,[8] both of which Citizens accepted even though they were late and only partial payments towards his past-due balance. (See Buzzell Aff. ¶ 4; Alves Dep. at 34.) Cobb expressly contemplated just such a situation, noting that "if the creditor sends a letter to preserve its rights and then once again accepts late payments, *another notice would be required*." 295 N.W.2d at 237 (emphasis added). Citizens' acceptance of late, partial payments following the December 17th letter necessitated further notice before it had a right to repossess the vehicle.

Defendants argue at length that the previous repossession of Buzzell's vehicle obviated the need for notice prior to the second repossession. They attempt to distinguish the facts in the instant case from Cobb, which involved a creditor that had repeatedly accepted late payments, never demanded full payment, and never taken any prior action to repossess. Unlike Cobb, they argue Buzzell cannot claim surprise or justifiable

---

[7] There is some evidence Citizens made additional attempts to contact Buzzell via telephone after December 17th. (See First Kuderer Aff. Ex. 15.) According to a summary of all of Citizens' communications to Buzzell, it made almost daily phone calls to Buzzell throughout January 2010 and into the beginning of February. (See id.) Defendants make no argument, however, that phone calls can provide sufficient Cobb notice, and both Cobb and the cases applying it contemplate notice being given in the form of a letter. Cobb, 295 N.W.2d at 237 ("[B]y the device of *one letter*, the creditor can totally preserve its remedies." (emphasis added)); accord, e.g., Akerlund v. TCF Nat'l Bank of Minn., No. Civ. 99-1537, 2001 WL 1631440, at *5 (D. Minn. June 11, 2001) (Davis, J.) (referring to notice as a "strict compliance letter"); Revering, 1999 WL 33911360, at *3 (same).

[8] Buzzell also claims he made a $300 payment on December 31, 2009; according to Citizens, however, this payment was returned for insufficient funds. (Alves Dep. at 34, 38-39.)

reliance on Citizens' inaction because it had already taken the very same action by repossessing his vehicle once before, mere months earlier.[9] Yet, when Buzzell's vehicle was repossessed the first time, Citizens required him to pay only two monthly payments and some fees to get it back, even though he was three months in default; it returned the vehicle while allowing him to remain a month in default on his loan. (See Alves Dep. II, at 48-49.) Although Buzzell saw that repossession was possible if he fell far enough into default, the first repossession also reinforced Citizens' previous pattern of allowing him to keep the vehicle despite being continually behind on his loan payments. Accepting further late payments and continuing not to insist on strict compliance with the loan terms necessitated, in the Court's view, another notice pursuant to Cobb before Citizens had the legal right to repossess the vehicle again, irrespective of the previous repossession.

Defendants also argue Cobb notice was not required because the loan agreement itself gave Citizens the right to repossess. They rely upon language from this Court stating that a secured party can repossess if there is "notice of the intent to repossess, either from the terms of the security agreement itself, or through a . . . Cobb notice." Revering, 1999 WL 33911360, at *3. Buzzell's loan agreement undeniably gave Citizens the right to repossess in the event of a default. Yet the same was true in Cobb. To argue that this precludes the need for additional notice ignores Cobb's holding that *despite* a

---

[9] At oral argument, counsel for Defendants also attempted to distinguish this case from Cobb by insisting that "[Defendants] have not repeatedly accepted late payments and done nothing about it." Yet the record reflects this is precisely what Citizens did. It accepted late payments from Buzzell time and again, allowing him to fall behind and remain behind on his payments throughout 2008 and 2009. Even after repossessing the vehicle the first time, it again failed to insist on strict compliance, allowing Buzzell to get the vehicle back while remaining one month behind and then repeatedly accepting late and partial payments between through January 2010.

contract providing the right to repossess, a pattern of inaction by the creditor "induced the justified reliance of the debtor in believing that late payments were acceptable"—in other words, repeated failure to insist on strict compliance means additional notice is needed, even if the contract provides for repossession. Cobb, 295 N.W.2d at 236.

Remarketing and PRSC argue that the bona fide error defense shields them from liability under the FDCPA. Bona fide error is an affirmative defense to an FDCPA claim, however, and as such generally must be asserted in a defendant's answer or is deemed to have been waived. E.g., Friedman & Friedman, Ltd. v. Tim McCandless, Inc., 606 F.3d 494, 498 (8th Cir. 2010) (noting that an affirmative defense not raised in the answer is generally forfeited); Sayre v. Musicland Grp., Inc., 850 F.2d 350, 354 (8th Cir. 1988) ("[F]ailure to plead . . . an affirmative defense results in a waiver of that defense and its exclusion from the case.") (citation omitted). Here, Defendants failed to raise this defense in their Answers, and accordingly the Court deems it waived.[10]

Remarketing and PRSC also argue that they had the right to rely on the so-called "repossession order" they received from Citizens as a representation of its present right to possession. They rely upon an opinion by this Court, stating that a repossession company "was entitled to rely on the representations of [the creditor] that [the creditor] had a present right to possess" a vehicle. Revering, 1999 WL 33911360, at *5. In the instant

---

[10] Furthermore, even if it had not been waived, Defendants have failed to present sufficient evidence to show they fell within the defense's protection. The defense requires "maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Here, the procedures Defendants argue they followed to avoid error—use of the IRIS system, background checks on repossession agencies, and updating one another on the status of the repossession—are in no way linked to ensuring that the creditor in fact had a present right to possess.

14

case, however, Citizens made no representation about its right to possess the vehicle. The only information provided to Remarketing was the "repossession order," a one-page document prepared by Citizens and transmitted via IRIS, which contained vehicle information and Buzzell's name and last known address. (See First Kuderer Aff. Ex. 14.) It was silent about collection attempts or communications with Buzzell leading up to the repossession. (Id.) Moreover, this Court noted in Revering that if the repossession company had inquired into the creditor's right to possess the vehicle, "it would have discovered that, at least according to [the bank's] files, Cobb notices had been sent and [the bank] had the right to possess the vehicle." 1999 WL 33911360, at *5. Here, as set forth above, Citizens' files would not have reflected adequate notice. The FDCPA is a "broad remedial statute that imposes strict liability on debt collectors; its terms are to be applied 'in a liberal manner.'" Cordes v. Frederick J. Hanna & Assocs., P.C., — F. Supp. 2d —, 2011 WL 2214939, at *2 (D. Minn. June 7, 2011) (Kyle, J.) (citations omitted). In the Court's view, it is inconsistent with the broad remedial purposes of the FDCPA to allow a repossession company to escape liability under § 1692f(6) simply because it received a repossession order from a creditor, which it blindly followed without any assurance of the creditor's present right to possess.

In short, Defendants were legally obligated to provide notice as required by Cobb. Based upon the evidence in the record, even when viewed in the light most favorable to Defendants, adequate Cobb notice was not provided. Accordingly, as a matter of law, there was no present right to possess the vehicle, and Defendants Remarketing and PRSC thus violated § 1692f(6) of the FDCPA when they repossessed Buzzell's vehicle.

## II.  Breach of Peace (Count II)

Section 336.9-609 of the Minnesota Statutes gives a secured party the right to self-help repossession of collateral in the event of a default.[11]  Specifically, it provides: "A secured party may proceed [to take possession of the collateral after default] without judicial process, if it proceeds without a breach of the peace."  Minn. Stat. § 336.9-609(a)-(b).  However, as set forth above, a secured party must comply with Cobb's notice requirement before it can lawfully attempt self-help repossession.  E.g., Steichen v. First Bank Grand, 372 N.W.2d 768, 771 (Minn. Ct. App. 1985) ("[Cobb] notice must be given before a creditor can legally exercise the statutory right of self-help repossession pursuant to Minn. Stat. § 336.9-503.")  In fact, it was in applying this statute that Cobb first imposed such a duty on a creditor.  295 N.W.2d at 236-37.

Where adequate notice is not provided, repossession is wrongful as a matter of law.  See Steichen, 372 N.W.2d at 771 (affirming judgment against defendant for a breach of this statute as a matter of law where the notice prior to repossession was deficient).  Here, the repossession of his vehicle was wrongful as a matter of law because Buzzell did not receive sufficient Cobb notice.  Accordingly, the Court need not reach the question of whether the manner in which the repossession was accomplished constituted a breach of peace.[12]

---

[11] This provision comes from Article 9 of the Uniform Commercial Code.  See U.C.C. § 9-609. It was previously found at U.C.C. § 9-503 and Minn. Stat. § 336.9-503.

[12] A question remains about which Defendants are liable on this claim.  It is asserted against all three Defendants, but "[c]ourts in this District have adopted varying and conflicting approaches" as to whether this statute creates a cause of action against repossession companies or only

### III.   Conversion and Trespass to Chattel (Count III)

The tort of conversion under Minnesota law requires proof that: "(1) the plaintiff has a property interest and (2) the defendant deprive[d] the plaintiff of that interest." Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 986, 987 (8th Cir. 2008).  Trespass to chattel differs from conversion "only in degree" and may be more appropriately used where the interference with the plaintiff's property right is incomplete.  Wilkinson v. United States, 564 F.3d 927, 932 (8th Cir. 2009) (citing Restatement (Second) of Torts § 222A, cmt. A).  Stated differently, a trespass to chattel typically involves less than a complete divestment of the plaintiff's possessory rights in his property, while conversion is the "exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  Restatement (Second) of Torts § 222A(1); accord Hildegarde, Inc. v. Wright, 70 N.W.2d 257, 259 (Minn. 1955).

The parties do not dispute that Buzzell's vehicle was taken from the garage of his apartment complex and was eventually re-sold by Remarketing on Citizens' behalf.  The taking and re-sale of property constitutes a complete deprivation of property rights sufficient to support a claim for conversion.  Defendants argue that they cannot be liable

---

secured parties. Revering, 1999 WL 33911360, at *4.  Nevertheless, it is clear that Citizens (the secured party) is liable under § 336.9-609.  See Nichols v. Metro. Bank, 435 N.W.2d 637, 641 (Minn. Ct. App. 1989) (finding bank's duty under § 336.9-503 "nondelegable," meaning it could be liable for any damages caused by the repossession company); see also, Uniform Commercial Code, Former § 9-503, cmt. 3 (2002) ("[C]ourts should hold the secured party responsible for the actions of others taken on the secured party's behalf, including independent contractors engaged by the secured party to take possession of collateral.").  Accordingly, all three Defendants will remain in the case on at least some claim—Remarketing and PRSC on Count I, and Citizens on Count II.  If the parties cannot reach an agreement on damages following this Order, the Court will determine in advance of trial whether Remarketing and PRSC can be liable on Count II.

for conversion or trespass to chattel because Citizens was the rightful owner of the vehicle and had the right to possess it following Buzzell's default. As outlined above, however, Defendants did <u>not</u> have a lawful right to repossess the vehicle from Buzzell even though he was in default, due to inadequate <u>Cobb</u> notice.

The sale of unlawfully repossessed property constitutes a conversion. <u>E.g.</u>, <u>Bloomquist v. First Nat'l Bank of Elk River</u>, 378 N.W.2d 81, 86 (Minn. Ct. App. 1985). Hence, Defendants' lack of a present right to possess the vehicle at the time of the repossession means they are also liable for conversion, and counsel for Defendants acknowledged as much at oral argument.[13]

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Buzzell's Motion for Partial Summary Judgment as to Defendants' Liability (Doc. No. 80) is **GRANTED**, and Defendants' Motion for Summary Judgment (Doc. No. 76) is **DENIED**.[14]

Dated: July 13, 2011              s/Richard H. Kyle
                                  RICHARD H. KYLE
                                  United States District Judge

---

[13] As with Count II, it is again unclear whether all three Defendants can be held liable on Count III. Again, however, because each Defendant is liable on at least one claim and all will remain in the case, the Court will take up the question of which Defendants are liable on which specific claims in advance of trial only if the parties are unable to reach an agreement on damages.

[14] In view of this Order, the Court urges the parties to attempt to resolve the remaining issues in advance of the settlement conference currently scheduled before Judge Noel on October 3, 2011.